IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| **CARY HIXSON**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DR. MICHAEL MORAN,** in his | ) | |
| individual capacity, | ) | |
| | ) | |
| **KATHERINE RAYNES,** | ) | Civil Action No. 5:17-cv-32 |
| a nurse and employee of | ) | Consolidated with 5:18-cv-1 |
| Southern Health Partners, Inc., | ) | |
| | ) | |
| **JANELLE SEEKFORD,** | ) | |
| a nurse and employee of | ) | |
| Southern Health Partners, Inc., | ) | |
| | ) | |
| **SOUTHERN HEALTH PARTNERS, INC.,** | ) | JURY TRIAL DEMANDED |
| | ) | |
| **ROCKINGHAM COUNTY, VIRGINA,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **THE CITY OF HARRISONBURG,** | ) | |
| **VIRGINIA,** | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT FOR MONETARY DAMAGES

Plaintiff, Cary Hixson, files this Amended Complaint in accordance with

42 U.S.C. § 1983 as the statutory vehicle to vindicate his rights under the Eighth

and Fourteenth Amendments of the U.S. Constitution, and pursuant to the

Constitution and laws of the Commonwealth of Virginia.

## **INTRODUCTION**

1.

When it comes to treating inmates that have medically diagnosed (and life-

threatening) illnesses, the staff of Harrisonburg-Rockingham Regional Jail

("HRRJ") are simply inhumane. For example, Plaintiff, Mr. Hixson, is a medically

diagnosed diabetic. And at the time he entered HRRJ, medical staff knew that

Mr. Hixson was diabetic because he told them, and HRRJ staff verified his status

as a diabetic through medical records. Despite this knowledge, Defendants Dr.

Moran, Katherine "Laney" Raynes, Janelle Seekford, and Southern Health

Partners, Inc. ("SHP") never—not once—provided Mr. Hixson with medically

ordered and required insulin or other prescribed medication to help control Mr.

Hixson's serious diabetes. As a result, Mr. Hixson suffered excruciating pain

throughout his feet, hands and legs, as well as experienced blurred vision,

ringing in his ears, on top of his vital organs slowly depreciating in

functionality—Dr. Moran knew all this because Mr. Hixson communicated to Dr.

Moran, Seekford, Raynes, and SHP about his experience. In a desperate measure

to assuage the negative effects of his untreated diabetes while at HRRJ, ***Hixson***

*would exercise furiously in his cell for 15 to 30 minutes at a time trying to lower his blood sugar levels because he didn't receive his medication.*

2.

In fact, for months, Defendants monitored Mr. Hixson's fasting blood sugar levels by drawing his blood in the morning—and despite Defendants seeing that Mr. Hixson suffered from escalating, skyrocketing blood sugar levels in the continuous, debilitating range of **160 to 407**, Defendants refused to provide Mr. Hixson with insulin or prescribe medication to control Mr. Hixson's medically diagnosed problem. Making matters way worse, Raynes threatened Mr. Hixson with solitary confinement if he continued to complain about not receiving his insulin or prescribed medication to treat his medically diagnosed health condition.

3.

While Mr. Hixson was incarcerated at HRRJ, Defendants showed deliberate indifference to Mr. Hixson's diagnosed and serious medical need for his prescribed insulin and other medication, which Plaintiff had been taking to treat his medically diagnosed, serious diabetes. The host of evils perpetrated on Mr. Hixson also include medical malpractice regarding his ignored and desperate need for diabetic medication. By refusing to treat Mr. Hixson's known, serious medical condition, Defendants breached all duties of care owed to Mr.

3

Hixson regarding his health and wellbeing, utterly neglected Mr. Hixson's safety, and acted with reckless indifference to the consequences that their actions would cause Mr. Hixson serious injury. In addition, on information and belief, HRRJ actually had a policy (informal or otherwise) in which insulin-dependent diabetics, including Cary Hixson, were intentionally refused insulin or other diabetic medication to control blood sugar levels because of the cost of said medication.

## JURISDICTION AND VENUE

4.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(4), under 42 U.S.C. § 1983, and on the supplemental jurisdiction of this Court to adjudicate claims arising under state law pursuant to 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b) and L.R. 2 (b) because (1) a substantial part of the events and omissions giving rise to Mr. Hixson's claims occurred within this District and Division and (2) Defendants reside and transact business in this District and Division.

## ADMINISTRATIVE EXHAUSTION

5.

Mr. Hixson is not incarcerated and thus does not have to show that administrative remedies related to his claims have been exhausted.

## PARTIES

### A. Cary Hixson, Plaintiff

6.

Plaintiff Mr. Cary Hixson is aged 54, and currently not incarcerated. The facts pertaining to his claims are outlined in the Relevant Facts Section and Counts below.

### B. Dr. Moran, Defendant

7.

Defendant Dr. Michael Moran, at all times relevant, was the medical doctor at HRRJ.

8.

At all times relevant to this Complaint, Dr. Moran was responsible for ensuring that he knew all controlling law within the Fourth Circuit regarding deliberate indifference to medical needs, breaching duties of care, and complete neglect of inmate safety, including the Fourth Circuit Court of Appeals' case law with respect to under-medicating inmates and flat-out denying demonstrably required prescription medication to inmates under Moran's care.

9.

At all times relevant to this Complaint, Dr. Moran was acting under the color of state and federal laws, and Dr. Moran was responsible for knowing and acting in accordance with all policies, procedures, orders, special orders, general

5

orders, guidelines and regulations of HRRJ, while upholding his responsibility as the doctor for HRRJ.

### C. SHP Nurse Katherine Raynes, Defendant

10.

Defendant Nurse Katherine Raynes ("Nurse Raynes"), at all relevant times, was a nurse employed by Southern Health Partners, Inc. ("SHP") to provide medical care to the inmates of HRRJ.

11.

At all times relevant to this Complaint, Nurse Raynes was responsible for ensuring that she knew all controlling law within the Fourth Circuit regarding deliberate indifference to medical needs, breaching duties of care, complete neglect of inmate safety, and willful and wanton negligent conduct, including the Fourth Circuit Court of Appeals' case law with respect to under-medicating inmates and flat-out denying demonstrably required prescription medication to inmates under Nurse Raynes's care.

12.

At all times relevant to this Complaint, Nurse Raynes was acting under the color of state and federal laws, she was responsible for knowing and acting in accordance with all policies, procedures, orders, special orders, general orders,

guidelines and regulations in effect at HRRJ, while upholding her duties of care to inmates at HRRJ.

### D. SHP Nurse Janelle Seekford, Defendant

13.

Defendant Nurse Janelle Seekford ("Nurse Seekford"), at all relevant times, was a nurse employed by Southern Health Partners, Inc. ("SHP") to provide medical care to the inmates of HRRJ.

14.

At all times relevant to this Complaint, Nurse Seekford was responsible for ensuring that she knew all controlling law within the Fourth Circuit regarding deliberate indifference to medical needs, breaching duties of care, complete neglect of inmate safety, and willful and wanton negligent conduct, including the Fourth Circuit Court of Appeals' case law with respect to under-medicating inmates and flat-out denying demonstrably required prescription medication to inmates under Nurse Seekford's care.

15.

At all times relevant to this Complaint, Nurse Seekford was acting under the color of state and federal laws, she was responsible for knowing and acting in accordance with all policies, procedures, orders, special orders, general orders,

guidelines and regulations in effect at HRRJ, while upholding her duties of care to inmates at HRRJ.

### E.  Southern Health Partners, Inc., Defendant

16.

Defendant Southern Health Partners, Inc., at all relevant times, was a Tennessee corporation doing business in and with the Commonwealth of Virginia as a regional health care provider that employs and contracts with medical care professionals to provide medical care to inmates at HRRJ.

### F.  Rockingham County, Virginia, Defendant

17.

Defendant Rockingham County, at all times relevant, was a political subdivision of the Commonwealth of Virginia.

### G. City of Harrisonburg, Virginia, Defendant

18.

Defendant City of Harrisonburg, at all times relevant, was a political subdivision of the Commonwealth of Virginia.

8

## RELEVANT FACTS

**A. Facts related to Mr. Hixson's Blood Sugar readings and Defendants' failure to provide him with his diabetic medication**

19.

At all relevant times to this Complaint, Nurse Raynes was responsible for providing medical care to the inmates of HRRJ, including Mr. Hixson.

20.

At all relevant times to this Complaint, Nurse Seekford was responsible for providing medical care to the inmates of HRRJ, including Mr. Hixson.

21.

Upon entering HRRJ, SHP personnel performed a medical screening of Mr. Hixson and inquired as to whether Mr. Hixson was taking prescribed medication, and Mr. Hixson told SHP personnel that he suffered from medically diagnosed diabetes and as a result, he must take medication (including insulin) to treat his serious diabetes.

22.

After Mr. Hixson told SHP personnel that he suffered from diabetes, and that he had been prescribed insulin medication, Mr. Hixson provided SHP nurses with information as to where to acquire his medical records from previous medical providers.

9

23.

During Mr. Hixson's entire stay at HRRJ, Nurse Raynes and Nurse Seekford knew Mr. Hixson required diabetes medication because Nurse Raynes and Nurse Seekford reviewed Mr. Hixson's medical records, which demonstrated that while at HRRJ, Mr. Hixson required prescribed diabetes medication to treat his condition and also required a diabetic diet.

24.

While Mr. Hixson was incarcerated at HRRJ, SHP nurses actually recorded in Mr. Hixson's records that Mr. Hixson was a Type 1 Diabetic.

25.

Nurse Raynes and Nurse Seekford took daily fasting blood sugar readings from Mr. Hixson, and both read and recorded Hixson's blood sugar levels on a SHP form called the Blood Sugar Flow Sheet.

26.

The Blood Sugar Flow Sheet states at the top of the page that: blood sugar tests check for conditions such as hypoglycemia (low blood sugar), pre-diabetes, and diabetes; common tests include a **fasting blood sugar** which is no eating or drinking for at least 8 hours prior to testing.

10

27.

The physician order/instructions at the top of Mr. Hixson's Blood Sugar Flow Sheet indicate that the SHP nurses, including Nurse Raynes and Nurse Seekford, were to check Mr. Hixson's Fasting Blood Sugar levels in the morning.

28.

Combined, Nurses Nurse Raynes and Nurse Seekford took blood sugar readings from Mr. Hixson **150 times.**

29.

Of the 150 times Nurse Raynes and Nurse Seekford took blood sugar readings from Mr. Hixson, 139 of those readings were recorded as taken at 04:30am.

30.

The Blood Sugar Flow Sheet states at the top of the page that: **blood sugar tests less than 110 is considered normal**.

31.

Of the 150 times that Nurses Nurse Raynes and Nurse Seekford took blood sugar readings, Mr. Hixson's blood sugar test read **less than 110 mg/dL only three (3) times**, meaning that Mr. Hixson's blood sugar test read over 110 mg/DL **one hundred forty-seven (147) times** as not normal.

11

32.

Mr. Hixson's blood sugar levels were measured as being **over 180** mg/dL

on **41 occasions**, and actually measured as high as **407 mg/dL**.

33.

Nurse Raynes had the authority to ensure medication was ordered to treat

Mr. Hixson's medically diagnosed diabetes.

34.

Nurse Seekford had the authority to ensure medication was ordered to

treat Mr. Hixson's medically diagnosed diabetes.

35.

Nurse Raynes had the authority to provide Mr. Hixson with some type of

medication to treat Mr. Hixson's medically diagnosed diabetes.

36.

Nurse Seekford had the authority to provide Mr. Hixson with some type of

medication to treat Mr. Hixson's medically diagnosed diabetes.

37.

Despite Mr. Hixson's severely high blood sugar levels, Nurse Raynes

refused to provide Mr. Hixson with insulin to treat his medically diagnosed

diabetes.

38.

Despite Mr. Hixson's severely high blood sugar levels, Nurse Seekford refused to provide Mr. Hixson with insulin to treat his medically diagnosed diabetes.

39.

Despite Mr. Hixson's severely high blood sugar levels, Nurse Raynes refused to order Mr. Hixson insulin to treat his medically diagnosed diabetes.

40.

Despite Mr. Hixson's severely high blood sugar levels, Nurse Seekford refused to order Mr. Hixson insulin to treat his medically diagnosed diabetes.

41.

Despite Mr. Hixson's severely high blood sugar levels, Nurse Raynes refused to order Mr. Hixson any medication to treat his medically diagnosed diabetes.

42.

Despite Mr. Hixson's severely high blood sugar levels, Nurse Seekford refused to order Mr. Hixson any medication to treat his medically diagnosed diabetes.

43.

Despite Mr. Hixson's severely high blood sugar levels, Nurse Raynes refused to provide Mr. Hixson with any medication that treats diabetes.

44.

Despite Mr. Hixson's severely high blood sugar levels, Nurse Seekford refused to provide Mr. Hixson with any medication that treats diabetes.

45.

As a professional nurse, Nurse Raynes knew the serious, life-threatening risks of untreated diabetes and high blood sugar levels because she was trained to know those risks prior to reading and understanding that Mr. Hixson suffered from untreated diabetes and high blood sugar levels.

46.

As a professional nurse, Nurse Seekford knew the serious, life-threatening risks of untreated diabetes and high blood sugar levels because she was trained to know those risks prior to reading and understanding that Mr. Hixson suffered from untreated diabetes and high blood sugar levels.

47.

As a professional nurse, Nurse Raynes knew the risks to Mr. Hixson in particular if his diabetes went untreated because she was trained to know those

risks prior to reading and understanding that Mr. Hixson suffered from untreated diabetes and high blood sugar levels.

48.

As a professional nurse, Nurse Seekford knew the risks to Mr. Hixson in particular if his diabetes went untreated because she was trained to know those risks prior to reading and understanding that Mr. Hixson suffered from untreated diabetes and high blood sugar levels.

49.

As a medical professional, Nurse Raynes knew that extended periods of high blood sugar levels could cause excruciating pain, as well as blurred vision, ringing in the ears, and severe discomfort because Nurse Raynes received training about the negative physical effects that occur from untreated diabetes, such as pain, ringing of the ears, blurred vision, and discomfort.

50.

As a medical professional, Nurse Seekford knew that extended periods of high blood sugar levels could cause excruciating pain, as well as blurred vision, ringing in the ears, and severe discomfort because Nurse Seekford received training about the negative physical effects that occur from untreated diabetes, such as pain, ringing of the ears, blurred vision, and discomfort.

51.

As a medical professional, Nurse Raynes knew that extended periods of high blood sugar levels cause damage to internal organs because Nurse Raynes received training with respect to internal organ damage caused by untreated diabetes.

52.

As a medical professional, Nurse Seekford knew that extended periods of high blood sugar levels cause damage to internal organs because Nurse Seekford received training with respect to internal organ damage caused by untreated diabetes.

53.

During Mr. Hixson's stay at HRRJ, Nurse Raynes repeatedly refused to provide Mr. Hixson with his required, prescribed diabetes medications, including insulin, despite the fact that Nurse Raynes had the authority to ensure Mr. Hixson was ordered the prescription medication.

54.

During Mr. Hixson's stay at HRRJ, Nurse Seekford repeatedly refused to provide Mr. Hixson with his required, prescribed diabetes medications, including insulin, despite the fact that Nurse Seekford had the authority to ensure Mr. Hixson was ordered the prescription medication.

55.

By her repeated refusal to provide Mr. Hixson with any medication to treat his diabetes (including Mr. Hixson's required, prescribed diabetes medication), Nurse Raynes allowed Mr. Hixson's diabetes to go untreated.

56.

By her repeated refusal to provide Mr. Hixson with any medication to treat his diabetes (including Mr. Hixson's required, prescribed diabetes medication), Nurse Seekford allowed Mr. Hixson's diabetes to go untreated.

57.

As a result of Nurse Raynes and Nurse Seekford's repeated refusal to provide Mr. Hixson with any medication to treat his diabetes (including his required, prescribed diabetes medication such as insulin), Mr. Hixson suffered severe, excruciating pain throughout his feet, hands and legs, as well as experiencing blurred vision and ringing in his ears for months.

58.

Mr. Hixson's bodily functions were severely impaired due to Nurse Raynes's refusal to provide Mr. Hixson with insulin or any medication to treat Hixson's diabetic condition.

59.

Mr. Hixson's bodily functions were severely impaired due to Nurse Seekford's refusal to provide Mr. Hixson with insulin or any medication to treat Hixson's diabetic condition.

60.

Nurse Raynes refused to request that Dr. Moran, the HRRJ physician, provide Mr. Hixson with any medication to treat Mr. Hixson's diabetes.

61.

Nurse Seekford refused to request that Dr. Moran, the HRRJ physician, provide Mr. Hixson with any medication to treat Mr. Hixson's diabetes.

62.

On many occasions, Mr. Hixson made complaints to Nurse Raynes and Nurse Seekford about the failure of Dr. Moran, nurses Nurse Raynes and Nurse Seekford, and SHP to provide him with required insulin to treat his disability.

63.

Mr. Hixson told Nurse Raynes and Nurse Seekford about the physical ailments he was suffering due to Nurse Raynes and Nurse Seekford's refusal to provide Mr. Hixson with any medication to treat his diabetes.

64.

Mr. Hixson's complaints of severe pain and discomfort due to his untreated diabetes were directly received by Nurse Raynes.

65.

Mr. Hixson's complaints of severe pain and discomfort due to his untreated diabetes were directly received by Nurse Seekford.

66.

As a result of being made aware of Mr. Hixson's complaints, Nurse Raynes knew that Mr. Hixson was regularly experiencing excruciating pain throughout his feet, hands and legs, as well as experiencing blurred vision and ringing in his ears for months.

67.

As a result of being made aware of Mr. Hixson's complaints, Nurse Seekford knew that Mr. Hixson was regularly experiencing excruciating pain throughout his feet, hands and legs, as well as experiencing blurred vision and ringing in his ears for months.

68.

In response to Mr. Hixson's complaints about not receiving any medication to treat his diabetes, Nurse Raynes threatened to place Mr. Hixson in segregation if he continued to request medication to treat his diabetes.

69.

Nurse Seekford was made aware that Nurse Raynes threatened to place Mr. Hixson in segregation if he continued to request medication to treat his diabetes.

70.

Nurse Raynes was not disciplined for threatening to place Mr. Hixson in segregation if he continued to request medication to treat his diabetes.

71.

Nurse Seekford approved Nurse Raynes's threats to place Mr. Hixson in segregation if he continued to request medication to treat his diabetes.

72.

In fear for his physical wellbeing and his life, Mr. Hixson continued to complain that he needed to receive his insulin to treat his diabetes.

73.

In response to Hixson's continued complaints, Nurse Raynes tried to have the deputies put Mr. Hixson in segregation to punish him for requesting treatment of his diagnosed, serious medical condition and disability. *After that*, and after having requested diabetic medication for months, Hixson stopped requesting medication in fear for his life.

74.

Nurse Seekford was made aware that Nurse Raynes tried to have deputies place Mr. Hixson in segregation for complaining that he was not being given medication to treat his diabetes.

75.

Nurse Raynes was not disciplined for trying to have deputies place Mr. Hixson in segregation for complaining that he was not being given medication to treat his diabetes.

76.

Nurse Seekford approved Nurse Raynes's attempts to have deputies place Mr. Hixson in segregation for complaining that he was not being given medication to treat his diabetes.

77.

As a result of Nurse Raynes's total failure and refusal to provide diabetic medication to Mr. Hixson, a known diabetic, Mr. Hixson was severely and seriously injured, was put in fear of death, suffered extreme pain throughout his feet, hands and legs, suffered prolonged blurred vision and ringing in his ears, suffered damage to his internal organs, and lives in fear of a shortened life span as a result of damage to his internal organs.

78.

As a result of Nurse Seekford's total failure and refusal to provide diabetic medication to Mr. Hixson, a known diabetic, Mr. Hixson was severely and seriously injured, was put in fear of death, suffered extreme pain throughout his feet, hands and legs, suffered prolonged blurred vision and ringing in his ears, suffered damage to his internal organs, and lives in fear of a shortened life span as a result of damage to his internal organs.

**B.  Facts related to the liability of Southern Health Partners, Inc.**

79.

SHP, a Tennessee corporation doing business in and with the Commonwealth of Virginia, is a regional health care provider that employs and contracts with medical care professionals to provide medical care to inmates.

80.

At all relevant times, SHP was under a contract with Rockingham County to provide medical care services to the inmates of HRRJ.

81.

SHP's contract with Rockingham County stated that it would provide medical and support personnel reasonably necessary for the rendering of health care services to inmates at HRRJ.

82.

At all times relevant to this Complaint, SHP managed all phases regarding the provision of medical care to Hixson and other inmates at HRRJ.

83.

Mr. Hixson was an inmate at HRRJ during the period of time Rockingham County entered into a contract with SHP, a contract that required SHP to provide medical and support personnel reasonably necessary for the rendering of health care services to inmates at HRRJ such as Mr. Hixson.

84.

SHP entered into a contract with Janelle Seekford that provided that Janelle Seekford would be a licensed practical nurse who would render health care services to the inmates of HRRJ.

85.

SHP entered into a contract with Katherine Raynes that provided that Katherine Raynes would be a licensed practical nurse who would render health care services to the inmates of HRRJ.

86.

The contract between Rockingham County and SHP required SHP to hire medical staff.

87.

At all relevant times, Janelle Seekford and Katherine Raynes were employees of SHP.

88.

As employees of SHP, Janelle Seekford and Katherine Raynes rendered health care services to the inmates of HRRJ under the direction of SHP management.

89.

SHP established the work schedule for Janelle Seekford and Katherine Raynes.

90.

SHP established the operational procedures that Janelle Seekford and Katherine Raynes had to follow while working at HRRJ during all relevant times to this Complaint.

91.

SHP established standards of conduct—in addition to relevant, prevailing industry standards that applied to all Defendants—that Janelle Seekford and Katherine Raynes had to follow while working at HRRJ during all relevant times to this Complaint.

24

92.

SHP disciplined Janelle Seekford and Katherine Raynes whenever either

violated any of SHP's rules, polices, and/or regulations that applied to Janelle

Seekford and Katherine Raynes while they worked at HRRJ, during all relevant

times to this Complaint.

93.

SHP retained the authority to terminate Janelle Seekford and Katherine

Raynes's employment.

94.

Janelle Seekford and Katherine Raynes had to submit requests for vacation

to SHP, and SHP had to approve said requests in order for Janelle Seekford and

Katherine Raynes to take vacation time from their employment at HRRJ.

95.

At all relevant times, SHP had policies and procedures regarding the

management of pharmaceuticals including the receipt, storage, preparation,

dispensing, distribution, and had standing orders for both officers and nursing

staff at HRRJ, with respect to medical services provided to inmates at HRRJ.

96.

Upon entering HRRJ, SHP performed a medical screening of Mr. Hixson

and inquired as to whether Mr. Hixson was taking prescribed medication, and

Mr. Hixson told SHP that he suffered from medically diagnosed diabetes and as a result, he must take medication (including insulin) to treat his serious condition.

97.

After Mr. Hixson told SHP that he had suffered from diabetes and that he had been prescribed insulin medication, Mr. Hixson provided SHP with information as to where to acquire his medical records from previous medical providers and pharmacies, and SHP immediately requested his medical records.

98.

While knowing that Mr. Hixson suffered from medically diagnosed diabetes while Hixson was incarcerated at HRRJ, SHP refused to provide prescription medication (or any medication) to treat Mr. Hixson's known, medically diagnosed diabetes.

99.

By refusing to provide prescription medication (or any medication) to treat Mr. Hixson's diabetes, SHP violated standard guidelines that applied to the provision of diabetic mediation to incarcerated inmates at HRRJ.

100.

As a direct result of SHP's refusal to provide prescription medication (or any medication) to Mr. Hixson, Hixson was severely and seriously injured, was

26

put in fear of death, suffered extreme pain in his hands and feet, suffered blurred vision and ringing in his ears, suffered damage to his internal organs, and suffers in fear of a shortened life span as a result of damage to his internal organs.

### C.  Facts related to the liability of Dr. Moran

101.

Prior to providing medical services to Hixson, Rockingham County began paying Dr. Moran's salary in order for him to provide medical services to inmates at Rockingham County.

102.

While working on behalf of the County, and being paid by the County, Dr. Moran was required to ensure that Mr. Hixson received diabetic medication upon Mr. Hixson's medical records demonstrating that Mr. Hixson required diabetic medication.

103.

While working on behalf of the County, and being paid by the County, Dr. Moran was required to ensure that Mr. Hixson received diabetic medication when blood sugar tests performed by HRRJ medical staff demonstrated that Mr. Hixon required diabetic medication.

104.

While working on behalf of the County, and being paid by the County, Dr. Moran was required to order (by prescription or otherwise) diabetic medication for Mr. Hixson when blood sugar tests performed by HRRJ medical staff demonstrated that Mr. Hixon required diabetic medication.

105.

Defendant Moran was the medical doctor at HRRJ, from at least August 1, 2016 through January 29, 2017.

106.

From at least August 1, 2016 through January 29, 2017, Dr. Moran was an employee of Rockingham County.

107.

At the time that he was providing medical services to Mr. Hixson, Dr. Moran was acting on behalf of the government entity, Rockingham County.

108.

During that time period that Dr. Moran was the medical doctor at HRRJ, Dr. Moran had the obligation to provide Mr. Hixson with medication to treat his diabetes.

109.

During Mr. Hixson's entire stay at HRRJ, Dr. Moran knew Mr. Hixson required diabetes medication because Moran reviewed Mr. Hixson's medical records, which demonstrated that while at HRRJ, Mr. Hixson required prescribed diabetes medication to treat his condition.

110.

Dr. Moran instructed HRRJ staff to serve a diabetic diet meal plan to Mr. Hixson.

111.

Within two weeks of Mr. Hixson entering HRRJ, Dr. Moran recorded, in Mr. Hixson's medical records, that Mr. Hixson was a Type 1 diabetic.

112.

Dr. Moran ordered medical staff to check Mr. Hixson's fasting blood sugar levels every morning, and he made this order multiple times by writing the order on Mr. Hixson's Blood Sugar Flow Sheets.

113.

Dr. Moran had the authority to order Mr. Hixson medication to treat Mr. Hixson's diabetes, but nevertheless refused to provide Mr. Hixson with any medication to treat Mr. Hixson's diabetes, and refused to ensure that Mr. Hixson received some type of medication to treat Hixson's diabetes.

114.

Dr. Moran personally reviewed Mr. Hixson's Blood Flow Sheets, saw that

Mr. Hixson's blood sugar levels were always over 110 mg/dL (except three

times), and initialed each of the flow sheets by the blood sugar readings with an

"M."

115.

During Mr. Hixson's entire stay at HRRJ, Dr. Moran knew Mr. Hixson

required diabetes medication because Dr. Moran reviewed the blood sugar tests

that medical staff gave to Hixson on a daily basis, blood sugar tests that

demonstrated dangerously high blood sugar levels for a known Type 1 diabetic,

Mr. Hixson, whose medical records demonstrated that he had been prescribed

insulin to control his Type 1 diabetes.

116.

During Mr. Hixson's stay at HRRJ, Dr. Moran repeatedly refused to

provide Mr. Hixson with his required (and prescribed) diabetes medication,

including insulin.

117.

Dr. Moran received information from Mr. Hixson that Hixson suffered

severe, excruciating pain in his hands and feet, blurred vision, ringing in his ears,

and extreme discomfort.

118.

As a medical doctor, Dr. Moran knew the risks of untreated diabetes.

119.

As a medical doctor, Dr. Moran knew that prolonged periods of high blood sugar levels cause damage to the body's internal organs.

120.

As a medical doctor, Dr. Moran knew that prolonged periods of high blood sugar levels cause damage to the body's internal organs; Dr. Moran thus knew there were health risks to Mr. Hixson in particular if his blood sugar levels remained abnormal.

121.

During Mr. Hixson's six-month stay at HRRJ, Dr. Moran knew that Mr. Hixson's blood sugar levels reached severely high levels that, if untreated by diabetic medication, causes damage to the internal organs.

122.

Dr. Moran received complaints, which indicated the medical staff at HRRJ refused to provide Mr. Hixson with insulin required to treat his serious diabetes.

123.

As a result of Dr. Moran's total failure and refusal to provide medical care to a known diabetic, Mr. Hixson was severely and seriously injured, was put in

fear of death, suffered extreme pain in his hands and feet, suffered blurred vision and ringing in his ears, suffered damage to his internal organs, and suffers in fear of a shortened life span as a result of damage to his internal organs.

### D. Facts related to <u>Monell</u> claim

124.

During the time in which Mr. Hixson was incarcerated at HRRJ, approximately 4,000 blood sugar checks were performed on inmates at HRRJ.

125.

At all times relevant, costs for all prescription medication at HRRJ was the responsibility of HRRJ, except for emergency stock medication paid for by SHP.

126.

At all times relevant, Sheriff Brian Hutcheson served as the Jail Administrator of HRRJ. (ECF 41 ¶3.)

127.

With regards to the responsibility of sheriffs and jail superintendents for medicine, *inter alia*, Virginia law states that "[t]he sheriff or jail superintendent *shall purchase at prices as low as reasonably possible*…. such clothing and *medicine as may be necessary*." Va. Code Ann. § 53.1-126 (emphasis added).

128.

On information and belief, at all times relevant to this complaint, Sheriff
Brian Hutcheson was the final decisionmaker regarding the purchase of insulin
and other diabetic medicine for inmates at HRRJ. See Fed. R. Civ. P. 11(b)(3).

129.

On information and belief, at all times relevant to this complaint, Sheriff
Hutcheson was the final decisionmaker with respect to ordering diabetic
medication (including insulin). See Fed. R. Civ. P. 11(b)(3).

130.

On information and belief, at all times relevant to this complaint, Sheriff
Hutcheson was the final decisionmaker with regards to whether Rockingham
County and/or City of Harrisonburg would absorb the costs of diabetic
medication (including insulin) because, inter alia, ordering diabetic medication is
inextricable from the county/city paying for said medication. See Fed. R. Civ. P.
11(b)(3).

131.

Virginia law further states that "[i]nvoices or itemized statements of
account from each vendor of such… medicines shall be obtained by the sheriff or
jail superintendent and presented for payment to the governing body of the city
or county or, in the case of regional jails, the regional jail authority or, if none,

33

*that body responsible for the fiscal management of the regional jails, which shall be*
*responsible for the payment thereof.*" Va. Code Ann. § 53.1-126 (emphasis added).

132.

At all times relevant, HRRJ was a "regional jail" as defined by Va. Code
Ann. § 53.1-105.

133.

Virginia law further states that, "[e]xcept as provided in § 53.1-114 [for
state reimbursements], the expenses of operating and maintaining a regional jail
and supporting the prisoners working thereon, including… medical attention,
shall be borne by the participating political subdivisions."  Va. Code Ann. § 53.1-
112.

134.

At all times relevant to this complaint, Rockingham County and the City of
Harrisonburg were the fiscal agents and operators of HRRJ. (ECF 41 ¶3.)

135.

At all times relevant to this complaint, Insulin had a "$$$" rating in SHP's
Drug Formulary for HRRJ, the highest rating, in terms of costs for medication.

136.

At all times relevant to this complaint, SHP's Protocol for Diabetics at
HRRJ, approved by Dr. Moran for use at HRRJ, stated that diabetics with fasting

34

blood sugar levels of 150 or above should receive fast-acting insulin on a sliding
scale.

137.

At all times relevant to this complaint, there was no medical reason for
denying insulin or other diabetic medication to HRRJ inmates with insulin-
dependent diabetes, including Mr. Hixson, when their blood sugar levels were
above 150.

138.

At all times relevant to this complaint, there was no medical justification
for knowingly and repeatedly denying prescribed medication, for approximately
five months, to treat a known insulin dependent diabetic, with blood sugar levels
ranging from the 150s all the way up to 407.

139.

On information and belief, at all times relevant to this complaint, Dr.
Moran was the final decisionmaker at HRRJ with regards to prescribing diabetic
medication to insulin-dependent diabetics, such as Mr. Hixson. See Fed. R. Civ.
P. 11(b)(3).

140.

Prescribing medication is directly correlated to absorbing costs associated
with obtaining said prescribed medication.

141.

On information and belief, at all times relevant to this complaint, Moran was the final decisionmaker with regards to which diabetic inmates at HRRJ receive diabetic medication (including insulin). See Fed. R. Civ. P. 11(b)(3).

142.

On information and belief, at all times relevant to this complaint, Dr. Moran was the final decisionmaker with respect to ordering diabetic medication (including insulin). See Fed. R. Civ. P. 11(b)(3).

143.

On information and belief, at all times relevant to this complaint, Dr. Moran was the final decisionmaker with regards to whether Rockingham County and/or the City of Harrisonburg would absorb the costs of diabetic medication (including insulin) because, inter alia, ordering diabetic medication is inextricable from the city/county paying for said medication so that Moran's order would be filled. See Fed. R. Civ. P. 11(b)(3).

144.

On information and belief, prior to Mr. Hixson being incarcerated at HRRJ, HRRJ had a policy (informal or otherwise) of refusing to provide medication (including insulin) to inmates at HRRJ such as Mr. Hixson who were known by

medical staff at HRRJ (including the named Defendants) to suffer from medically diagnosed, insulin-dependent diabetes. <u>See</u> Fed. R. Civ. P. 11(b)(3).

145.

On information and belief, the basis of the policy of refusing to prescribe medication (including insulin) to insulin-dependent inmates who were known by HRRJ staff to suffer from medically diagnosed diabetes was the <u>cost</u> of the medication. <u>See</u> Fed. R. Civ. P. 11(b)(3).

146.

On information and belief, while Mr. Hixson was incarcerated at HRRJ, HRRJ's policy (informal or otherwise) of refusing to prescribe HRRJ inmates medication to treat known, medically diagnosed diabetes was in effect and thus applied to Mr. Hixson's request for HRRJ to prescribe him medication (including insulin) based on his known, medically diagnosed diabetic illness. <u>See</u> Fed. R. Civ. P. 11(b)(3).

147.

On information and belief, at all times relevant to this complaint, when Dr. Moran implemented HRRJ's policy (informal or otherwise) of refusing to prescribe HRRJ inmates such as Mr. Hixson diabetic medication (including insulin), as an employee of Rockingham County, Moran was acting on behalf of Rockingham County. <u>See</u> Fed. R. Civ. P. 11(b)(3).

148.

On information and belief, at all times relevant to this complaint, when Dr.

Moran implemented HRRJ's policy (informal or otherwise) of refusing to

prescribe HRRJ inmates such as Mr. Hixson diabetic medication (including

insulin), Moran was acting on behalf of the City of Harrisonburg. See Fed. R. Civ.

P. 11(b)(3).

## COUNT I
## VIOLATION OF MR. HIXSON'S EIGHTH AMENDMENT RIGHTS
## PURSUANT TO 42 U.S.C § 1983
(*Federal claim against Nurse Raynes, Nurse Seekford, and Dr. Moran in their individual capacities*)

149.

Plaintiff fully incorporates paragraphs 1 through 123, *and any paragraph this Court deems relevant*, as fully stated herein to support this Count.

150.

Based on the incorporated paragraphs to support this Count I, Defendants

Dr. Moran, Nurse Raynes, and Nurse Seekford violated Mr. Hixson's right to be

free from deliberate indifference to his known serious medical need for diabetic

medication (prescription or otherwise) to treat his known, medically diagnosed

condition of diabetes, and said right was clearly established at the time

Defendants Dr. Moran, Nurse Raynes, and Nurse Seekford deliberately failed to

provide Mr. Hixson with any medication at all to deal with Mr. Hixson's known

38

severe diabetic condition. Consequently, Mr. Hixson is entitled to all damages permissible under controlling law, as well as attorney fees and cost regarding this lawsuit.

## COUNT II
## MEDICAL MALPRACTICE
*(State claim against Dr. Moran, Nurse Raynes, Nurse Seekford, and SHP)*

151.

Plaintiff fully incorporates paragraphs 1 through 123, *and any paragraph this Court deems relevant*, as full stated herein to support this Count.

152.

Based on all the incorporated facts to support this Count II, as health care providers, by refusing to treat Mr. Hixson's known, serious medical condition, Defendants Dr. Moran, Raynes, Seekford, and SHP breached all duties of care owed to Mr. Hixson regarding his health and wellbeing, utterly neglected Mr. Hixson's safety, and acted with reckless indifference to the consequences of serious injury that their actions would cause Mr. Hixson. Mr. Hixson is entitled to all damages permissible under controlling law.

**COUNT III**
**RESPONDEAT SUPERIOR**
*(State claim against Southern Health Partners)*

153.

Plaintiff fully incorporates paragraphs 1 through 123, *and any paragraph this Court deems relevant*, as full stated herein to support this Count.

154.

Based on the incorporated facts to support this Count, Seekford and Raynes were acting as employees of Southern Health Partners when they each violated the duty of care owed to Mr. Hixson, a medically diagnosed diabetic, and when they acted with utter disregard for Mr. Hixson's safety and wellbeing, and when they acted with reckless indifference to the consequences of their actions and the serious injury it would cause Mr. Hixson. Consequently, Mr. Hixson is entitled to all damages permissible under controlling law.

**COUNT IV**
**MONELL CLAIM**
**VIOLATION OF MR. HIXSON'S EIGHTH AMENDMENT RIGHTS PURSUANT TO 42 U.S.C § 1983**
*(Federal claim against Rockingham County and City of Harrisonburg)*

155.

Plaintiff fully incorporates paragraphs 1 through 148, *and any paragraph this Court deems relevant*, as fully stated herein to support this Count.

156.

Based on the incorporated paragraphs to support this Count, Rockingham

County violated Mr. Hixson's right to be free from deliberate indifference to his

known serious medical need for diabetic medication (prescription or otherwise)

to treat his known, medically diagnosed condition of diabetes. Said right was

clearly established at the time Sheriff Hutcheson, on information and belief, as

Jail Administrator responsible for the purchase of diabetic medication for HRRJ,

refused to purchase diabetic medication for Mr. Hixson despite the fact that there

was no medical justification for not providing Mr. Hixson with diabetic

medication. As the final decisionmaker for the County with regards to

purchasing medications, including insulin to treat diabetes, Hutcheson, on

information and belief, implemented a policy (informal or otherwise) of denying

insulin and other prescription diabetic medication to insulin-dependent diabetics

incarcerated at HRRJ on the basis of *cost* instead of sound medical judgment.

Consequently, Mr. Hixson is entitled to all damages permissible under

controlling law, as well as attorney fees and cost regarding this lawsuit.

157.

Based on the incorporated paragraphs to support this Count, Rockingham

County violated Mr. Hixson's right to be free from deliberate indifference to his

known serious medical need for diabetic medication (prescription or otherwise)

to treat his known, medically diagnosed condition of diabetes. Said right was clearly established at the time Defendant Dr. Moran, as an agent of Rockingham County, deliberately failed to provide Mr. Hixson with any medication at all to deal with Mr. Hixson's known severe diabetic condition. As the final decision maker for the County with regard to which inmates at HRRJ received prescribed medications, including insulin to treat diabetes, Dr. Moran, on information and belief, implemented a policy (informal or otherwise) of denying insulin and other prescription diabetic medication to insulin-dependent diabetics incarcerated at HRRJ on the basis of *cost,* instead of sound medical judgment. Consequently, Mr. Hixson is entitled to all damages permissible under controlling law, as well as attorney fees and cost regarding this lawsuit.

158.

*The Amended Answer (ECF 41) to the First Amended Complaint explicitly states that both Rockingham County and the City of Harrisonburg are the fiscal agents and operators of the jail. Because of that joint fiscal responsibility, Plaintiff does not know which entity had the responsibility to pay for prescribed medication (e.g., insulin), or whether both entities jointly paid for prescribed medication. Consequently, Plaintiff pleads his Monell count against City of Harrisonburg as well because the Sheriff, charged with purchasing medication, including insulin, and Dr. Moran, responsible for*

42

*prescribing medication, including insulin, could have been acting on behalf of either or both entities.*

159.

Based on the incorporated paragraphs to support this Count, the City of Harrisonburg violated Mr. Hixson's right to be free from deliberate indifference to his known serious medical need for diabetic medication (prescription or otherwise) to treat his known, medically diagnosed condition of diabetes. Said right was clearly established at the time Sheriff Hutcheson, on information and belief, as Jail Administrator responsible for the purchase of diabetic medication for HRRJ, refused to purchase diabetic medication for Mr. Hixson despite the fact that there was no medical justification for not providing Mr. Hixson with diabetic medication. As the final decisionmaker for the City with regards to purchasing medications, including insulin to treat diabetes, Hutcheson, on information and belief, implemented a policy (informal or otherwise) of denying insulin and other prescription diabetic medication to insulin-dependent diabetics incarcerated at HRRJ on the basis of *cost* instead of sound medical judgment. Consequently, Mr. Hixson is entitled to all damages permissible under controlling law, as well as attorney fees and cost regarding this lawsuit.

160.

Based on the incorporated paragraphs to support this Count, the City of Harrisonburg violated Mr. Hixson's right to be free from deliberate indifference to his known serious medical need for diabetic medication (prescription or otherwise) to treat his known, medically diagnosed condition of diabetes. Said right was clearly established at the time Defendant Dr. Moran, as an agent of the City of Harrisonburg, deliberately failed to provide Mr. Hixson with any medication at all to deal with Mr. Hixson's known severe diabetic condition. As the final decision maker for the City of Harrisonburg with regard to which inmates at HRRJ received prescribed medications, including insulin to treat diabetes, Dr. Moran, on information and belief, implemented a policy (informal or otherwise) of denying insulin and other prescription diabetic medication to insulin-dependent diabetics incarcerated at HRRJ on the basis of *cost,* instead of sound medical judgment. Consequently, Mr. Hixson is entitled to all damages permissible under controlling law, as well as attorney fees and cost regarding this lawsuit.

## COUNT V
## PUNITIVE DAMAGES
(*Against Moran, Seekford, Raynes, and SHP individually*)

**Based on the facts alleged in this complaint,** Plaintiff is entitled to punitive damages, under all applicable laws, because Defendants Moran, Seekford, Raynes, and SHP acted with a willful and conscience indifference to the laws that protect Mr. Hixson.

## COUNT VI
## ATTORNEY FEES

**Based on the facts alleged in this Complaint,** Mr. Hixson is entitled to attorney fees for his federal § 1983 claims.

**WHEREFORE**, Mr. Hixson prays for a trial by jury of twelve and judgment against Defendants as follows:

(a) That process issue and service be had on each Defendant;

(b) That judgment be granted in favor of the Plaintiff against the Defendants, jointly and severally, for the injuries of Plaintiff;

(c) That Plaintiff recover compensatory damages including pain and suffering, lost income and future lost income, and other expenses in an amount to be determined at trial, including attorney fees;

(d) Plaintiff be awarded damages for his loss earnings and reduction in his earning capacity from Defendants;

(e) That Plaintiff recover costs of this litigation;

(f)  That a jury trial be had on all issues so triable;

(g) Plaintiff have Judgment against Defendants for punitive damages; and

(h) That Plaintiff receives such other and further relief as the Court deems

just and proper.

Respectfully submitted on this 17th day of April 2018,

/s/ MARIO B. WILLIAMS
Mario B. Williams (VSB #91955)

/s/ ANDREW R. TATE
Andrew R. Tate (Ga. Bar #518068)

**NEXUS DERECHOS HUMANOS ATTORNEYS, INC.**
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
404-654-0288/703-935-2453 FAX
mwilliams@ndhlawyers.com
atate@ndhlawyers.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing

**SECOND AMENDED COMPLAINT FOR MONETARY DAMAGES** with the

Clerk of Court using the CM/ECF system which will automatically send email

notification of such filing to all counsel of record.

Respectfully submitted on this 17th day of April 2018,

<u>/s/ MARIO B. WILLIAMS</u>
Mario B. Williams (VSB #91955)

<u>/s/ ANDREW R. TATE</u>
Andrew R. Tate (Ga. Bar #518068)

**NEXUS DERECHOS HUMANOS ATTORNEYS, INC.**
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
404-654-0288/703-935-2453 FAX
mwilliams@ndhlawyers.com
atate@ndhlawyers.com
*Counsel for Plaintiff*

47