CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
AUG 03 2018
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| CARY HIXSON, | ) |
| Plaintiff, | ) Civil Action Nos. 5:17-cv-00032 |
| | ) 5:18-cv-00001 |
| v. | ) |
| | ) By: Hon. Michael F. Urbanski |
| BRYAN HUTCHESON, et al. | ) Chief United States District Judge |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiff Cary Hixson, an insulin-dependent diabetic, alleges he was denied insulin while incarcerated at Harrisonburg-Rockingham Regional Jail ("HRRJ"). Hixson's Second Amended Complaint for Monetary Damages (the "SAC"), ECF No. 125, raises various claims against Defendants Dr. Michael Moran, Katherine Raynes, Janelle Seekford (collectively with Raynes, the "Nurse Defendants"), Southern Health Partners, Inc. ("SHP"), Rockingham County, Virginia ("Rockingham"), and the City of Harrisonburg, Virginia ("Harrisonburg," and collectively with Rockingham, the "Municipal Defendants").

This matter comes before the court on the Nurse Defendants' and Municipal Defendants' Motions to Dismiss. ECF Nos. 132, 146 & 151. For the reasons discussed below, the court will **GRANT in part** and **DENY in part** the Motions to Dismiss.[1]

---

[1] Hixson's First Amended Complaint, ECF No. 34, named Bryan Hutcheson and Steve Shortell as additional defendants. Hutcheson and Shortell have moved to dismiss the SAC as against them, alleging that "they are not specifically named in the [SAC] nor are any allegations made against them as individual parties." Defs. Hutcheson & Shortell's Mot. Dismiss SAC, ECF No. 137. Shortell is not mentioned in the SAC. While certain allegations concern Hutcheson, none of the counts in the SAC names Hutcheson. Accordingly, the court will **GRANT** Hutcheson and Shortell's motion to dismiss.

## I. Allegations

Plaintiff Cary Hixson is a 54-year-old man who was, at all relevant times, diagnosed with insulin-dependent diabetes.[2] SAC ¶¶ 6, 137. Hixson was previously incarcerated at HRRJ for six months, but is not currently incarcerated. Id. ¶¶ 6, 121. Hixson does not plead the exact dates during which he was incarcerated.

Sheriff Bryan Hutcheson was the jail administrator of HRRJ. Id. ¶ 126. Dr. Moran was a medical doctor employed by HRRJ. Id. ¶ 7. Additionally, Dr. Moran was employed by, and "working on behalf of," Rockingham County "[f]rom at least August 1, 2016 through January 29, 2017." Id. ¶¶ 102, 105. SHP is a regional health care provider that employs and contracts with medical care professionals to provide care to inmates at HRRJ. Id. ¶ 16. Nurses Katherine Raynes and Janelle Seekford were nurses employed by SHP to provide medical care to inmates of HRRJ. Id. ¶¶ 10, 13.

SHP was under contract to provide medical services at HRRJ. Id. ¶ 49. Prior to Hixson's incarceration at HRRJ, HRRJ, Hutcheson, and Dr. Moran developed a policy that prohibited all staff at HRRJ, including medical staff, from providing medication, including insulin, to diabetics housed at HRRJ. Id. ¶¶ 144, 157.

Upon incarceration at HRRJ, SHP performed a medical screening of Hixson. Id. ¶ 21. Hixson informed SHP personnel that he was diagnosed with diabetes and needed to take medication, including insulin, to control his diabetes. Id. The Nurse Defendants reviewed Hixson's medical files and confirmed he needed medication, including insulin, as

---

Additionally, Hixson and the Nurse Defendants have filed a Consent Motion to Deem as Moot the Complaint Filed Against the Nurse Defendants Prior to Plaintiff's Second Amended Complaint (the "Consent Motion"), ECF No. 126. The court will **GRANT** the Consent Motion and deem the SAC the operative complaint against all defendants.
[2] All facts herein are taken from the SAC, the allegations of which at this stage the court must take as true. See Cooper v. Pate, 378 U.S. 546, 546 (1964) (per curiam).

well as a diabetic diet, to treat his diabetes. Id. ¶ 23. Dr. Moran reviewed Hixson's medical files and knew that Hixson required treatment for his diabetes. Id. ¶ 109.

As ordered by Dr. Moran, the Nurse Defendants took Hixson's blood sugar levels daily a total of 150 times, and each reading was recorded on an SHP form. Id. ¶¶ 27–28, 112. While a blood-sugar level below 110 mg/dL is considered normal, Hixson's blood-sugar level read less than 110 mg/dL only 3 out of 150 times, over 180 mg/dL 41 times, and as high as 407 mg/dL.[3] Id. ¶¶ 30–32. Despite these high levels, and despite having the authority to do so, the Nurse Defendants refused to provide Hixson with or order insulin or other necessary diabetic medication. Id. ¶¶ 37–38. The Nurse Defendants did this despite knowing the risks to Hixson. Id. ¶ 45–46.

Hixson complained to Dr. Moran about the pain experienced due to not receiving insulin. Id. ¶ 117. Hixson also complained to the Nurse Defendants about the pain he experienced. Id. ¶¶ 66–67. Instead of treating Hixson, however, Raynes threatened Hixson with segregation, which Seekford approved, and asked HRRJ deputies to put Hixson in segregation because he continued to complain about not receiving proper treatment for his diabetes. Id. ¶¶ 68–73. Raynes was not disciplined for threatening Hixson with segregation. Id. ¶ 70.

Similarly, Dr. Moran reviewed Hixson's medical records and knew he needed insulin. Id. ¶¶ 117, 119. While Dr. Moran instructed the staff to serve Hixson a diabetic meal and personally reviewed Hixson's elevated blood-sugar levels, he refused to provide Hixson with

---

[3] "mg/dL" is an abbreviation for milligrams per deciliter. See Scinto v. Stansberry, 841 F.3d 219, 227 (4th Cir. 2016).

insulin or other diabetes medication. Id. ¶¶ 118–24. Dr. Moran refused to provide treatment to Hixson despite knowing the risks of failing to provide Hixson with insulin. Id. ¶¶ 127–29.

Because he was not treated at HRRJ, Hixson suffered severe, prolonged pain throughout his feet, hands, and legs, suffered from blurred vision and ringing in his ears for his entire stay at HRRJ, and currently suffers from organ damage and fears a shortened life expectancy due to organ damage. Id. ¶ 100.

The SAC contains six counts. Count I, pled against Dr. Moran and the Nurse Defendants in their individual capacities, alleges Section 1983 claims based on a violation of Hixson's Eighth Amendment rights. Count II, pled against Dr. Moran, the Nurse Defendants, and SHP, alleges state-law medical malpractice. Count III, pled against SHP, alleges state-law respondeat superior liability. Count IV, plead against the Municipal Defendants, alleges a Monell claim based on a violation of Hixson's Eighth Amendment rights. Count V, pled against Dr. Moran, the Nurse Defendants, and SHP in their individual capacities, seeks punitive damages. Finally, Count VI seeks attorneys' fees against unspecified parties.

## II. Motions to Dismiss

The Nurse Defendants[4] and Municipal Defendants move to dismiss all counts against them in the SAC under Federal Rule of Civil Procedure 12(b)(6).

### A. Legal Standard

Rule 12(b)(6) permits a dismissal when a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss,

---

[4] The Nurse Defendants moved to dismiss all claims against them, but do not argue whether they are subject to potential attorneys' fees or punitive damages. Because these issues have not been raised, the court takes no position on them.

4

a complaint must contain sufficient "facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555.

A court must construe factual allegations in the nonmoving party's favor and will treat them as true, but is "not so bound with respect to [a complaint's] legal conclusions." Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp., 609 F.2d 1083, 1085 (4th Cir. 1979). Indeed, a court will accept neither "legal conclusions drawn from the facts" nor "unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000). Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Only after a claim is stated adequately may it then "be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563.

### B. Count I: Violation of Hixson's Eighth Amendment Rights Pursuant to 42 U.S.C. § 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law. Crosby v. City of Gastonia, 635 F.3d 634, 639 (4th Cir. 2011) (citing West v. Atkins, 487 U.S. 42, 48 (1988)).

A person acting under color of state law "must either be a state actor or have a sufficiently close relationship with state actors such that a court would conclude that the non-state actor is engaged in the state's actions." DeBauche v. Trani, 191 F.3d 499, 506 (4th Cir. 1999). Accordingly, "[t]he color of law requirement excludes from the reach of § 1983

all 'merely private conduct, no matter how discriminatory or wrongful.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999)). "[T]he ultimate question of whether an actor was a state actor or functioning under color of law is a question of law for the court." Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 344 n.7 (4th Cir. 2000).

In their Motion to Dismiss, the Nurse Defendants first suggest they are not amenable to Section 1983 liability because they were not state actors. Mem. Supp. Mot. Dismiss ("Nurse Defs.' MTD Br."), ECF No. 113, at 4. The Nurse Defendants argue that they "rendered health care services under the direction of SHP management," a private entity. Id.

There are four circumstances under which a private party will be deemed a state actor:

> (1) when the state has coerced the private actor to commit an act that would be unconstitutional if done by the state; (2) when the state has sought to evade a clear constitutional duty through delegation to a private actor; (3) when the state has delegated a traditionally and exclusively public function to a private actor; or (4) when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen.

DeBauche, 191 F.3d at 507 (quoting Andrews v. Fed. Home Loan Bank of Atl., 998 F.2d 214, 217 (4th Cir. 1993)); see also Nurse Defs.' MTD Br. 5 (citing DeBauche); Pl.'s Resp. Opp. Mot. Dismiss Nurse Defs. ("Opp. Nurse Defs.' MTD"), ECF No. 142, at 4–5 (same).

The Supreme Court has "made clear . . . that the provision of medical services to prison inmates is traditionally the exclusive prerogative of the state." Conner v. Donnelly, 42 F.3d 220, 224 (4th Cir. 1994). Moreover, the U.S. Constitution requires Virginia "to provide adequate medical care to its prisoners because prisoners, due to their incarceration, cannot

6

obtain medical care on their own." Id. (citing Estelle v. Gamble, 429 U.S. 97, 103–04 (1976)).

In West v. Atkins, 487 U.S. 42, 54 (1988), the Supreme Court confirmed that state-employed medical professionals who provide medical services to inmates are state actors. Moreover, "[t]he fact that the State employed [the doctor] pursuant to a contractual arrangement that did not generate the same benefits or obligations applicable to other 'state employees' does not alter the analysis." Id. at 55. Instead, courts must examine the medical professional's "function within the state system, not the precise terms of his employment." Id. Accordingly, "a private physician under contract with [a state] to provide medical services to prison inmates, but not employed directly by the state, nonetheless acts under the color of state law when treating an inmate." Conner, 42 F.3d at 224 (citing West, 487 U.S. at 54–57).

The Fourth Circuit has further explained West, holding that a physician "who treats a prisoner acts under color of state law even though there was no contractual relationship between the prison and the physician." Id. at 223. Instead, it is dispositive that the state-run prison referred a prisoner to the physician and paid the physician to render medical services to the prisoner. Id. at 225. This is because the state authorizes the independent physician to provide inmates with medical care, and the inmates are forced to accept the treatment offered. Id.

The Nurse Defendants contend that they were controlled by SHP, a private entity, and therefore cannot be state actors. Nurse Defs.' MTD Br. 5. As Conner makes clear, however, the Nurse Defendants' direct employer is not dispositive. The Nurse Defendants "assume[d] the state's constitutional obligation to provide medical care to its prisoners."

7

Conner, 42 F.3d at 224. Any medical professional "authorized by the state to provide medical care to a prisoner exercises power that is traditionally the exclusive prerogative of the state." Id. at 225. Here, Hixson pleads that HRRJ authorized the Nurse Defendants to provide care to HRRJ inmates. SAC ¶¶ 19–20. At the pleadings stage, this allegation is sufficient to establish that the Nurse Defendants are state actors for purposes of Section 1983.

The only remaining question is whether the fact that the Nurse Defendants are nurses, rather than doctors, makes any differences in the analysis. It does not. Prison nurses are amenable to suit under Section 1983. See Smith v. Smith, 589 F.3d 736, 740 (4th Cir. 2009) (holding that nurse could be held liable under Section 1983 for destroying form that caused prisoner to be denied prescribed medication). Liability for private doctors under Conner is predicated upon the private doctors performing a "public function"—that is, the provision of medical services to inmates. DeBauche, 191 F.3d at 507; see also Conner, 42 F.3d at 224. Here, Hixson pleads that the Nurse Defendants stepped into the shoes of the state by providing medical care to HRRJ inmates. Under Conner, therefore, the Nurse Defendants are state actors.

### C. Count II: Medical Malpractice

In the court's February 9, 2018 Memorandum Opinion (the "Memorandum Opinion"), the court concluded that because Hixson pleaded that "Dr. Moran was employed by Rockingham County," Hixson's medical malpractice claims were barred by sovereign immunity insofar as those claims sounded in ordinary negligence. Hixson v. Hutcheson, No.

8

5:17-cv-00032, 2018 WL 814059, at *6 (W.D. Va. Feb. 9, 2018). The Nurse Defendants similarly claim that they are entitled to sovereign immunity. Nurse Defs.' MTD Br. 7.

At the threshold, the court also held that Dr. Moran could be held liable for medical malpractice sounding in gross negligence, and, further, Hixson had adequately pled gross negligence against Dr. Moran. Hixson, 2018 WL 814059, at *5–8. The medical malpractice claims against the Nurse Defendants arise from the same underlying facts as the medical malpractice claims against Dr. Moran. As the court's analysis in the previous Memorandum Opinion applies equally here, the court holds that that the medical malpractice claims against the Nurse Defendants cannot be dismissed insofar as they sound in gross negligence.

Moreover, the court predicated its analysis in the Memorandum Opinion upon Hixson pleading that Dr. Moran was a state employee. See id. at *6 ("The court will consider as true Hixson's allegations that Dr. Moran was an employee of HRRJ."). The court applied the James test to determine if Dr. Moran, a state physician, could avail himself of immunity. Id. at *5 (citing Messina v. Burden, 228 Va. 301, 313, 321 S.E.2d 657, 663 (1984); James v. Jane, 221 Va. 43, 53 267 S.E.2d 108, 113 (1980)). But "the James test is not applicable if the individual is an independent contractor and, thus, not an employee or agent of the Commonwealth." Atkinson v. Sachno, 261 Va. 278, 283, 541 S.E.2d 902, 905 (2001).

It is usually for the jury to determine if a person is an independent contractor or an employee, but "when 'the evidence admits of but one conclusion, the question is one of law.'" Id. at 284, 541 S.E.2d at 905 (quoting Hadeed v. Medic-24, Ltd., 237 Va. 277, 288, 377 S.E.2d 589, 594 (1989)). The Supreme Court of Virginia requires courts to use a four-factor test to determine if a medical professional is a state employee or a contractor: "(1) selection

9

and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power to control the work of the individual." Id. at 284–85, 541 S.E.2d at 905 (citing Hadeed v. Medic-24, Ltd., 237 Va. 227, 288, 377 S.E.2d 589, 594–95 (1989)). The fourth factor—the power to control—is determinative. Id.

The Nurse Defendants rely on certain allegations in the SAC that they portray as proof that HRRJ had the power to control their work. They point to the allegations that the Nurse Defendants were "employed by [SHP] to provide medical care to the inmates of HRRJ," SAC ¶¶ 10, 13, that Hutcheson and Dr. Moran were "the final decisionmaker[s] with respect to ordering diabetic medication," id. ¶¶ 129, 142, and that HRRJ enacted a policy to prevent diabetics from receiving medicine, id. ¶¶ 144, 146. See Reply Pl.'s Resp. Opp. Nurse Defs.' MTD, ECF No. 143, at 4.

But Hixson also pleads that Defendants exercised their own authority in the care of Hixson. Hixson alleges the Nurse Defendants had the authority to order and provide Hixson with medicine, yet refused to do so. SAC ¶¶ 33–44. Further, Hixson alleges the Nurse Defendants refused to request that Dr. Moran provide Hixson with medication. Id. ¶¶ 60–61. And Hixson alleges Raynes threatened to place Hixson in segregation for complaining about his medical treatment. Id. ¶¶ 68–76.

With these conflicting allegations, the court cannot conclude as a matter of law that HRRJ controlled the Nurse Defendants' work and, therefore, cannot on the pleadings hold

that the Nurse Defendants are employees or agents of the state subject to sovereign immunity.[5]

### D. Count IV: Monell Claims

Hixson's SAC raises new Monell claims against Rockingham and Harrisonburg. In Monell v. New York City Department of Social Services, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities and local governments are "persons" susceptible to Section 1983 liability. See also Berkley v. Common Council of City of Charleston, 63 F.3d 295, 296 (4th Cir. 1995). But a municipality may only face Section 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Spell v. McDaniel, 824 F.2d 1380, 1385 (4th Cir. 1987) (quoting Monell, 436 U.S. at 694). While the "policy" is generally found "in municipal ordinance [or] regulations," the offending "policy" may "also be found in formal or informal ad hoc 'policy' choices or decisions of municipal official authorized to make and implement municipal policy." Id. Because Monell liability only attaches when the municipality enacts official policy that causes a constitutional injury, "liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).

The court looks to state law when determining if an official had final policymaking authority. See id. at 483; Weiner v. Albemarle Cty., Va., No. 3:17-cv-00046, 2018 WL

---

[5] At first blush, it may seem contradictory that the Nurse Defendants can be state actors for Section 1983 purposes but potentially private actors for medical malpractice purposes. This distinction arises from the origin of the claims and defenses, however. The court looks to federal law to determine who is a state actor for Section 1983 purposes. Medical malpractice, however, is a state claim. Virginia law determines who may avail themselves of sovereign immunity for medical malpractice.

11

542979, at *5 (W.D. Va. Jan. 24, 2018). The ultimate "question is whether the [official] was a final policymaker <u>for the local government</u> in a particular area, or on a particular issue." <u>Weiner</u>, 2018 WL 542979, at *5 (quoting <u>Lane v. Anderson</u>, 660 F. App'x 185, 197 (4th Cir. 016). In making that determination, the court "must look to the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." <u>Riddick v. Sch. Bd. of City of Portsmouth</u>, 238 F.3d 518, 523 (4th Cir. 2000). Moreover, "[a] municipal policy may be pronounced or tacit and reflected in either action or inaction, either way, [a] [p]laintiff must allege it with factual specificity, rather than by bare and conclusory statements." <u>Vail v. City of New York</u>, 68 F. Supp. 3d 412, 431 (S.D.N.Y. 2014) (internal citations and quotations omitted). Finally, "a suit against a governmental officer in his official capacity is the same as a suit against [the] entity of which [the] officer is an agent, and that victory in such an official-capacity suit imposes liability on the entity that [the officer] represents." <u>McMillan v. Monroe Cty., Ala.</u>, 520 U.S. 781, 785 n.2 (1997) (alterations in original) (internal quotations and citations omitted).

Hixson ultimately alleges that the policy complained of was a policy of HRRJ: "Plaintiff alleged that HRRJ had a policy, per . . . Hutcheson and . . . Dr. Moran, of denying inamates . . . diabetic medication because of the high cost of that medication." Pl.'s Consol. Resp. Opp. Municipal Defs.' Mot. Dismiss ("Municipal Defs. MTD Opp."), ECF No. 156, at 13. Hixson is alleging that both Hutcheson and Dr. Moran were policymakers for HRRJ, which, Hixson claims, creates liability for the Municipal Defendants under <u>Monell</u>.

### 1. Municipal Liability for HRRJ

The SAC alleges that "HRRJ was a 'regional jail'" under Va. Code Ann. § 53.1-105. SAC ¶ 132, and that Hutcheson was the jail administrator, id. ¶ 126. Hixson correctly notes that Virginia law requires regional jail superintendents to "purchase at prices as low as reasonably possible . . . such clothing and medicine as may be necessary." Id. ¶ 127 (emphasis omitted) (quoting Va. Code Ann. § 53.1-126). Hixson also correctly quotes who pays for the medication:

> [I]nvoices or itemized statements of account from each vendor of such . . . medicines shall be obtained by the sheriff or jail superintendent and presented for payment to the governing body of the city or county or, in the case of regional jails, the regional jail authority or, if none, that body responsible for the fiscal management of the regional jails, which shall be responsible for the payment thereof.

Id. ¶ 131 (second alteration in original) (emphasis omitted) (quoting Va. Code Ann. § 53.1-126).

But Hixson misapplies the law in concluding that the Municipal Defendants must be the ultimate policymakers for Monell purposes. Under Virginia law, the ultimate operator of a jail must either be a regional jail authority or board, see Va. Code Ann. § 53.1-106(A), or the sheriff, see id. § 53.1-116.2. In either case, a municipality is not the operator of the jail, and cannot be held liable under Monell for the policies instituted by the jail. See Strickler v. Waters, 989 F.2d 1375, 1390 (4th Cir. 1993) (city not liable under Monell for sheriff's operation of jail); Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999) (county not liable under Monell for sheriff's operation of jail); Thornhill v. Aylor, No. 3:15-CV-00024, 2016 WL 8737358, at *6 (W.D. Va. Feb. 19, 2016) (finding a Monell claim could be pled against the regional jail authority).

13

Unsurprisingly, the court has been unable to find any case in which a Monell plaintiff complaining of injuries arising out of an alleged policy in a regional jail has sued the municipality responsible for the fiscal management of the regional jail. Instead, these plaintiffs invariably sue the regional jail authority or board. Hixson affirmatively alleges that HRRJ is a regional jail. As such, any Monell liability for the alleged policies of Hutcheson and Dr. Moran extends only to the regional jail board or authority.[6]

At oral argument, Hixson countered that Section 53.1-126 suggests the possibility that a municipality can operate a regional jail, relying on the following language: "[T]he regional jail authority or, if none, that body responsible for the fiscal management of the regional jails . . . shall be responsible for the payment of" certain invoices. Va. Code Ann. § 53.1-126. Hixson argues that the "if none" language leaves open the ability of a municipality to run a regional jail.

Hixson misinterprets Section 53.1-126. That Section concerns payment of certain invoices, not the legal operator of a regional jail. Notably, the Section requires the "body responsible for the fiscal management of the regional jail[]" to pay for the invoices, not the body responsible for the operation of the regional jail.

Instead, Section 53.1-106 governs the legal operator of a regional jail, and mandates that "[e]ach regional jail . . . shall be supervised or managed by a board or authority." Id.

---

[6] Because Hixson has not sued the HRRJ board or authority, the court takes no position as to whether that board or authority is amenable to suit. The court notes, however, conflicting case law on that issue. Compare Dales v. Haysi Reg'l Jail, 2016 WL 7168278, at *1 (W.D. Va. Dec. 8, 2016) (dismissing claim against regional jail but noting that "a governmental entity, such as a regional jail authority, is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation"); Newbrough v. Piedmont Reg'l Jail Auth., No. 3:10CV867-HEH, 2012 WL 12931710, at *2 (E.D. Va. Jan. 12, 2012) (noting that a particular regional jail authority "has litigated no less than fifteen times in" the Eastern District of Virginia), with Painter v. Blue Ridge Reg'l Jail Auth., No. 6:17-cv-00034, 2017 WL 3725993, at *5 (W.D. Va. Aug. 29, 2017) (holding that a regional jail authority "is not subject to suit under § 1983 because it is an arm of the Commonwealth of Virginia" and collecting cases).

14

§ 53.1-106 (emphasis added). This language is mandatory. Section 53.1-106 leaves no room for a municipality to operate a regional jail. Moreover, Hixson ignores that Section 53.1-106 allows either an authority <u>or</u> a board to run a regional jail. The most natural reading of the language at issue is that if a regional jail is governed by a board, rather than an authority, then the "body responsible for the fiscal management of the regional jail[]" shall pay for the invoices.

The cases upon which Hixson relies also fail to salvage his claims against the Municipal Defendants. Hixson's reliance on <u>Thornhill v. Aylor</u>, No. 3:15-CV-00024, 2016 WL 8737358 (W.D. Va. Feb. 19, 2016), is especially misplaced, as <u>Thornhill</u> supports this court's analysis. Hixson is certainly correct that the <u>Thornhill</u> "complaint plausibly alleged that the superintendent was a policymaker at the jail authority." Municipal Defs. MTD Opp. 15 (citing <u>Thornhill</u>, 2016 WL 8737358, at *7); <u>see also</u> <u>Thornhill</u>, 2016 WL 8737358, at *6 ("The court finds that the complaint contains sufficient factual allegations to support the claim that there was an official policy of deliberate indifference at CVRJ, specifically based on [the superintendent's] inactions as its policymaker."). But, as is relevant here, that is all <u>Thornhill</u> held: A regional jail superintendent is a policymaker for the regional jail authority. There is no suggestion that a regional superintendent is a policymaker for the constitutive members of the regional jail authority. In fact, the <u>Thornhill</u> plaintiff did not sue the constitutive members.

For the same reason, Hixson's appeal to <u>Newbrough v. Piedmont Regional Jail Authority</u>, 822 F. Supp. 2d 558 (E.D. Va. 2011), <u>vacated in part on other grounds by</u> 2012 WL 12931710 (E.D. Va. Jan. 12, 2012), fares no better. Again, the <u>Newbrough</u> plaintiff sued

15

the regional jail authority—not the constitutive municipalities. Newbrough held that, at the motion to dismiss stage, "the Court can reasonably infer that, as the highest-ranking officer at Piedmont [Regional Jail Authority], Superintendent Toney's acts and edicts constituted official policy." Id. at 586. Accordingly, Newbrough found that the regional jail authority was responsible for the policies of its superintendent under Monell. Id. There is nothing in Newbrough suggesting that the constitutive municipalities were also subject to Monell liability.

Additionally, Hixson claims that Section 53.1-126 created a fiduciary relationship between Hutcheson and the Municipal Defendants, such that the Municipal Defendants "were the fiscal agents and the only entities for which these policies could be designed to benefit." Municipal Defs.' MTD Opp. 17.

Other courts have considered and rejected similar arguments. In Alfaro-Garcia, plaintiff argued "that because Henrico County funds the operation of the sheriff's office, the sheriff's enforcement of immigration detainers necessarily constitutes a policy of Henrico County itself." Alfaro-Garcia, 2016 WL 5388946, at *8; cf. Municipal Defs.' MTD Opp 15 ("Plaintiff pled that HRRJ's policy was fairly attributable to [Municipal Defendants], the statutory fiscal agents of HRRJ responsible for paying inmate medication."). Relying on Strickler, Alfaro-Garcia "utterly" rejected this argument. Id. "Although Virginia law may obligate the City to provide for the physical upkeep of the Jail, it does not render the City liable for the operations within—that is the sole purview of [the sheriff]." Id. (quoting Sleeper v. City of Richmond, No. 3:12cv441, 2012 WL 3555412, at *8 (E.D. Va. Aug. 16,

2012)). This court agrees: the fact that the Municipal Defendants financially supported HRRJ is insufficient, in and of itself, to impute Monell liability on the Municipal Defendants.

In sum, under Virginia law, a jail may only be operated by a regional jail authority or board, or by a sheriff. While those entities may be subject to Monell liability, there is no basis upon which to extend such liability to the Municipal Defendants.

### 2. Dr. Moran

Finally, Dr. Moran's alleged policy of refusing to give diabetic inmates insulin does not trigger Monell liability for the Municipal Defendants, for much the same reasons as discussed above. To be sure, Hixson pleads that Dr. Moran was an employee of Rockingham.[7] SAC ¶¶ 101, 106; Am. Answer of Defs. Hutcheson, Shortell & Moran, ECF No. 41, ¶ 6. That fact, however, does not end the story.

Hixson argues that "Dr. Moran was the final decisionmaker at HRRJ with regards to prescribing diabetic medication to insulin-dependent diabetics." Municipal Defs. MTD Opp. 16 (citing SAC ¶¶ 139–41). Further, Hixson claims that Dr. Moran was "the final decisionmaker with regards to ordering diabetic medication and whether Rockmingham [or] . . . Harrisonburg would absorb the costs of diabetic medication (including insulin) because, inter alia, ordering diabetic medication is inextricable from the city/county paying for said medication." Id. at 17 (citing SAC ¶¶ 142–43). Hixson concludes that the SAC "at least plausibly suggest[s] that Dr. Moran was the final decisionmaker with regards to prescribing and ordering diabetic medication that the [Municipal Defendants] would be on the hook for." Id. (citations omitted).

---

[7] At oral argument, Hixson indicated that discovery suggests Dr. Moran is actually controlled by SHP. That allegation is not in the SAC, however, and the court will not consider it.

Hixson's argument has two components: (1) Dr. Moran was the final policymaker for HRRJ with regard to prescribing diabetic medication, and (2) Dr. Moran was the final policymaker for HRRJ with regard to ordering diabetic medication. Neither component states a Monell claim against the Municipal Defendants.

For purposes of a motion to dismiss, the court accepts that Dr. Moran was the final policymaker for HRRJ with regard to prescribing diabetic medication. But Hixson's allegation is that Dr. Moran was the final policymaker <u>for HRRJ</u>. As the court concluded above, the ultimate operator of HRRJ must either be the regional board or authority or the sheriff. The court has already held that Monell liability, to the extent it exists, attaches to one of those entities—and not the Municipal Defendants. That holding does not change because Hixson claims the alleged policy came from Dr. Moran instead of Hutcheson.

The court is not required to accept that Dr. Moran was the final policymaker for HRRJ with regard to ordering diabetic medication, however, because by statute the jail superintendent or sheriff is responsible. Va. Code Ann. § 53.1-126. Hixson admits as much. See SAC ¶ 127 (quoting Va. Code Ann. § 53.1-126); Municipal Defs. MTD Opp. 16. As a matter of law, Dr. Moran cannot be the final policymaker for ordering diabetic medication. Even if he were, the court has already held that the Municipal Defendants cannot be liable under Monell for the medication ordering policies of HRRJ.

### III. Conclusion

Hixson's allegations are sufficient to deny the Nurse Defendants' motion to dismiss in its entirety, but Hixson fails to plead claims against the Municipal Defendants. The court will **DENY** the Nurse Defendants' motion to dismiss. The court will **GRANT** with

18

**prejudice** the Municipal Defendants' motions to dismiss. Finally, the court will **GRANT without prejudice** defendants Hutcheson and Shortell's motion to dismiss, as the SAC does not contain claims against them.

Entered: 08-03-2018

/s/ Michael F. Urbanski
Michael F. Urbanski
Chief United States District Judge