CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 23 2019

JULIA C. DUDLEY, CLERK
BY: /s/
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

CAREY HIXSON, )
            )
    Plaintiff, )
            )
v.          )    Civil Action No.:   5:17-CV-032
            )                        5:18-CV-001
            )
BRYAN HUTCHESON, et al., ) By: Michael F. Urbanski,
            )      Chief U.S. District Judge
    Defendants. )

## MEMORANDUM OPINION

Plaintiff Carey Hixson ("Hixson"), an insulin-dependent diabetic, alleges he was denied insulin while incarcerated at the Harrisonburg-Rockingham Regional Jail ("HRRJ"), giving rise to a violation of his Eighth Amendment rights and a state-law claim of gross negligence. Hixson's Second Amended Complaint for Monetary Damages, ECF No. 125, raises these claims against Defendant Dr. Michael Moran ("Dr. Moran"), the doctor at HRRJ during Hixson's incarceration. This matter comes before the court on Dr. Moran's Motion for Summary Judgment. ECF No. 189. For the reasons given below, the court **GRANTS** the motion.

I.[1]

Hixson was first diagnosed with type 2 diabetes in April 2015 during a hospitalization at Rockingham Memorial Hospital ("RMH"). ECF No. 199-5, at 49. During the same hospital stay, he was also diagnosed with methamphetamine-induced psychosis,

---

[1] The facts of this case are summarized below and, consistent with the summary judgment standard, are viewed in the light most favorable to Hixson. See Walker v. Mod-U-Kraft Homes, LLC, 775 F.3d 202, 205 n.1 (4th Cir. 2014) (citing FDIC v. Cashion, 720 F.3d 169, 173 (4th Cir. 2013)).

polysubstance abuse, and alcohol abuse. Id. A consultation note by a physician on April 26, 2015 recorded that Hixson had a history of intermittent blurry vision and paresthesias of the hand and feet. Id.

Dr. Moran was the medical doctor for inmates at HRRJ during Hixson's incarceration. ECF No. 199-3, at 5. He was employed by Rockingham County to provide medical care to the inmates. Id. at 6. Hixson entered HRRJ on August 23, 2016 and was released on January 29, 2017. ECF No. 199-2, at 31. Upon entry, Hixson was seen by a nonparty intake nurse. ECF No. 199-3, at 7–8. He informed her that he had type 1, insulin-dependent diabetes, but the intake nurse was unable to confirm the diagnosis, despite faxing a record request to Hixson's medical provider. Id. Dr. Moran testified that the medical team at HRRJ was unable to obtain Hixson's medical history because "when [Hixson] signed his release form, he wrote do not release mental health information," and Hixson's diagnosis of diabetes was made during his stay in the psychiatric unit of RMH. ECF No. 199-2, at 8. Policy dictated that a nurse repeat the record request if a health provider failed to respond within 24 hours. ECF No. 199-4, at 10. If the provider still did not respond within 24 hours of the second request, policy required that the nurse call the physician for orders and document that no records were ever received. Id. While the original record request to Hixson's provider was made, no evidence has been elicited showing a repeat request was made or that Dr. Moran was contacted regarding the failure to secure records. Id.

Dr. Moran reviewed the information taken by the intake nurse and placed Hixson on a diabetic diet. ECF No. 199-2, at 8. He also ordered Hixson's blood sugar levels be tested every day. Id. For the first four months of his incarceration, Hixson's blood sugar readings

2

were variable, with some normal and some elevated scores.[2] See ECF No. 113-12, at 18–22. Hixson's September readings ranged from a low of 94 mg/dL on September 24, 2016 to a high of 157 mg/dL on September 22, 2016. Id. Likewise, in October, his low reading was 118 mg/dL on October 3, 2016 and his high reading was 169 mg/dL on October 5, 2016. Id. November's readings creeped up, but remained variable, from a low of 137 mg/dL on November 25, 2016 to a high of 239 mg/dL on November 3, 2016. Id. December's readings, while higher, still fluctuated from 118 mg/dL on December 24, 2016 to 277 mg/dL on December 7, 2016. Id. Hixson's blood sugar values retained this variability in January 2017. Id. On three days that month, January 21, 24, and 28, Hixson's twice daily readings were more than 100 points apart. Id.

Hixson also began occasionally refusing testing, claiming apprehension in interacting with Nurse Katherine Raynes after a confrontation with her over insulin.[3] ECF No. 199-2, at 34. Dr. Moran reviewed the blood sugar readings on a weekly basis, as indicated by his initials in Hixson's medical record. ECF No. 199-4, at 13. In response to the higher readings, Dr. Moran ordered that the blood sugar tests be performed twice daily in January 2017, but at no point did Dr. Moran prescribe Hixson any type of oral diabetes medication or insulin injections. ECF No. 199-2, at 23. While Hixson claims he repeatedly asked nursing staff for insulin, nothing in the record indicates that Hixson reported any symptoms of elevated blood sugar to either a nurse or Dr. Moran. Indeed, Hixson was seen by Dr. Moran on

---

[2] Official policy at HRRJ set a normal fasting blood sugar range of 60-110 mg/dL. ECF No. 112-12, at 6. The American Diabetes Association suggests a target range of 80-130 mg/dL. American Diabetes Association, Checking Your Blood Glucose, (last edited Oct. 9, 2018), http://diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/checking-your-blood-glucose.html.
[3] Nurse Raynes vaguely remembers the confrontation but does not remember if Hixson requested insulin. ECF No. 199-4, at 15.

3

September 29, 2016 and did not relate any symptoms of or discuss diabetes. ECF No. 199-2, at 35. Nor did Hixson file an official grievance or complaint asking for insulin or any other form of diabetes treatment. Id.

Hixson filed his original lawsuit on March 31, 2017 against Dr. Moran and various other defendants who have since been dismissed.[4] ECF No. 1. Hixson alleges the following causes of action against Dr. Moran: (1) Dr. Moran violated Hixson's "right to be free from deliberate indifference to his known serious medical need for diabetic medication (prescription or otherwise) to treat his known, medically diagnosed condition of diabetes," ECF No. 125, at 38; and (2) Dr. Moran committed medical malpractice, a state law claim which has been dismissed to the extent it sounds in negligence, rather than gross negligence. ECF No. 125, at 38; ECF No. 167. Hixson also seeks punitive damages and attorneys' fees, premised on the liability under 42 U.S.C. § 1983 against Dr. Moran. ECF No. 125, at 45.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with…[any] affidavits" filed by

---

[4] Hixson's original complaint brought claims against two "John Doe" nurses. ECF No. 1. On January 3, 2018, Hixson filed Hixson v. Raynes, 5:18-cv-001-MFU, which brought claims against Raynes and Janelle Seekford, another nurse at HRRJ. As this second action brought identical claims against Raynes and Seekford as were first brought against the Doe nurses and alleged the same facts alleged in Hixson's original complaint, it was clear from the face of the Raynes complaint that Raynes and Seekford are, in fact, the Doe nurses named in Hixson's original complaint. ECF No. 94, at 6. The court thus consolidated the two cases. ECF No. 95. On November 19, 2018, Raynes and Seekford were dismissed as defendants. ECF No. 198.

4

the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and may prevail by showing "an absence of evidence to support" an essential element of the nonmoving party's case. Celotex, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward with specific material facts that prove there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Although "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor,'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment. Anderson, 477 U.S. at 252. Rather, a genuine issue of material fact exists only "if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must

5

determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

### III.

Count I alleges a violation of Hixson's Eighth Amendment Rights pursuant to 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law. Crosby v. City of Gastonia, 635 F.3d 634, 639 (4th Cir. 2011) (citing West v. Atkins, 487 U.S. 42, 48 (1988)). To prove an Eighth Amendment violation, Hixson must show that he suffered a sufficiently serious deprivation and that Dr. Moran acted with "deliberate indifference" to his health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citations omitted). This is a two prong test, with the first, "objective" prong requiring a demonstration of the seriousness of the deprivation and the second, "subjective" prong requiring a showing of the defendant's "sufficiently culpable" state of mind. Farmer, 511 U.S. at 834.

### A.

As a starting point, Hixson must meet the objective prong of the Farmer test by raising a genuine question of material fact that "the deprivation alleged [was], objectively, 'sufficiently serious.'" Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298, (1991)). Ultimately, the deprivation must be "extreme"—meaning it must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from…exposure to the challenged

conditions." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted). In medical needs cases, like the case at hand, the Farmer test requires plaintiffs demonstrate officials' deliberate indifference to a "serious" medical need that has either "been diagnosed by a physician as mandating treatment or...is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Hixson was diagnosed with type 2 diabetes prior to his incarceration at HRRJ. ECF No. 199-5, at 48–50. At that time, he was prescribed Metformin, Lantus, and Humalog to manage the condition. Id. at 58. Upon his arrival at HRRJ on August 23, 2016, Hixson informed the intake nurse that he was diabetic and had been prescribed these medications. ECF No. 199-3, at 9–11. As stated above, this was never confirmed. Id. Dr. Moran reviewed this information, placed Hixson on a diabetic diet, and ordered daily testing of his blood sugar levels, but did not prescribe insulin or any other type of medication used to treat diabetes. Id. Dr. Moran saw Hixson in person only once during his incarceration—on September 29, 2016, when Hixson requested a physician visit for treatment of back pain and high blood pressure. ECF No. 199-2, at 48. Hixson did not complain of any symptoms related to diabetes, nor did he mention his diabetes to Dr. Moran during the appointment. On January 19, 2017, after Hixson's blood sugar levels began to rise, Dr. Moran ordered Hixson's blood sugar be tested twice a day, but still prescribed him no medication. ECF No. 199-3, at 23.

When a § 1983 claim for inadequate medical treatment involves a complicated health condition, expert testimony is required to show proof of causation of injury. Edwards v.

7

Graham Cty. Jail, No. 1:16-CV-315-FDW, 2017 WL 5894496, at *6 (W.D.N.C. Nov. 29, 2017). Hixson alleges he suffered pain, discomfort and fear while incarcerated and severe impairment of his "bodily functions" as a result of the months spent without medication. ECF No. 125, at 18. He relies upon Dr. Carol Rupe as his expert witness and asserts that her testimony shows he suffered sufficiently serious harm.

Dr. Rupe testified that a type 2 diabetic will typically require elevated blood sugar levels for 15-20 years before sustaining damage to internal organs, retinopathy, or neuropathy. ECF No. 199-5, at 53–54. It is undisputed that Hixson spent only five months in HRRJ under Dr. Moran's care. In addition, the record is unclear as to how long Hixson had suffered from diabetes before his official diagnosis or to what extent his symptoms predate his incarceration. Moreover, Dr. Rupe testified that she could not be certain that Hixson has suffered or will suffer any damage or injury because of the time spent at HRRJ without medication. Id. at 47, at 52–54.

At oral argument, Hixson conceded that there was insufficient evidence of long-term permanent injury but claimed he suffered short-term serious injury in the form of discomfort, pain, and fear. In his deposition, Hixson stated that while incarcerated at HRRJ, he had "clouded" vision, neuropathy, and tingling and pain in his feet, ECF No. 199-2, at 14, although there is no evidence that he voiced these symptoms to medical staff at HRRJ. Courts have found that permanent physical impairment is unnecessary to show an injury sufficient to constitute serious harm under the Eighth Amendment. See Easter v. Powell, 467 F.3d 459, 464–65 (5th Cir. 2006) ("Even if [the plaintiff] failed to state an Eighth Amendment violation with regard to the delay in medical treatment…[he] clearly stated an

Eighth Amendment violation with regard to the severe chest pain he suffered...") (holding that pain suffered while waiting for treatment is sufficient to state an Eighth Amendment violation).

As Dr. Moran points out, some of the symptoms described by Hixson and Dr. Rupe predate Hixson's time in jail and thus were not caused by the claimed failure to medicate while at HRRJ. ECF No. 199-5, at 50. Also noteworthy is Hixson's six-month delay in seeking medical care after his January 29, 2017 release. ECF No. 199-5, at 109–11. Rule 56, however, does not require that the non-movant's case be without flaw or doubt. It requires only that the facts, when viewed in the light most favorable to the non-moving party, raise a genuine question of material fact. While the facts adduced leave many questions unanswered, the court finds that Hixson presents enough evidence supporting his position to permit a reasonable jury to find he suffered a serious, albeit short-lived, harm.

**B.**

Having made a showing sufficient to meet the Rule 56 standard as to the objective seriousness of the deprivation suffered, Hixson must now make a showing that Dr. Moran's subjective mental state was that of deliberate indifference. Deliberate indifference requires "a higher degree of disregard than mere negligence." Farmer, 511 U.S. at 837. A prison official "must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw that inference." Brice v. Virginia Beach Correctional Center, 58 F.3d 101, 105 (4th Cir. 1995). This showing requires "more than mere negligence," though "less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. The standard "lies

9

somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law." Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995).

Dr. Moran argues that nothing in the record shows he was deliberately indifferent to Hixson's serious medical condition. To satisfy the subjective prong of the Farmer test, Hixson would have to show that Dr. Moran knew Hixson's blood sugar readings represented a substantial risk of harm while Hixson was under his care, and yet took no action. See Farmer, 511 U.S. at 837. Dr. Moran argues Hixson cannot show this, as nothing in the record indicates either such a state of mind or such inaction. The court agrees.

While Dr. Moran did not prescribe insulin or any other type of medication for Hixson, he stated rational medical reasons for not doing so. Dr. Moran stated that, because Hixson's blood sugar readings varied, an insulin prescription could have led to hypoglycemia if taken while levels were low. This reasoning, combined with the diabetic diet and daily blood testing, is sufficient to show that Dr. Moran was not deliberately indifferent to Hixson's condition. See Peterson v. Davis, 551 F. Supp. 137, 146 (D. Md. 1982) ("[t]he mere failure to treat all medical problems…even if that failure amounts to medical malpractice, is insufficient to support a claim under § 1983").

Dr. Moran's expert witness, Dr. Rose Suaava, opined that the decision not to administer insulin was reasonable, given the variable nature of Hixson's blood sugar readings and weight during his incarceration. ECF No. 190-9, at 3. Hixson's expert, Dr. Rupe, counters that Dr. Moran saw Hixson's rising blood sugar readings and took no action. She claims that increased testing is not treatment and that Hixson's blood sugar levels called for

the use of insulin. ECF No. 199-5, at 76. In her opinion, Dr. Moran should have prescribed insulin for Hixson beginning in December 2016. Id. at 102. Clearly, Dr. Rupe, Dr. Moran, and Dr. Suaava disagree as to what was the proper way to handle Hixson's rising blood sugar. Deliberate indifference, however, requires that the treatment given "be so grossly incompetent, inadequate, or excessive as to shock the conscience or…be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Negligence, malpractice, or incorrect diagnosis do not alone give rise to a violation of the Eighth Amendment. Id. That a prisoner did not receive the treatment desired does not constitute deliberate indifference, nor does disagreement between two medical professionals. Id. See Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (stating that a prison doctor's treatment decisions could be "gravely" mistaken and disagree with a former diagnosis and prescribed treatment plan by an outside specialist without running afoul of the Eighth Amendment). Instead, Hixson must show that Dr. Moran failed to provide care he himself felt to be necessary. Id. ("…a doctor's failure to provide care that he himself deems necessary to treat an inmate's serious medical condition may constitute deliberate indifference.").

The record gives no evidence that this occurred. Dr. Moran reviewed Hixson's blood sugar readings and found them too variable to prescribe insulin. Dr. Rupe looks at these same numbers and comes to a different opinion. A finding of deliberate indifference does not follow from a disagreement between medical professionals. The court also notes that the record provides no evidence Dr. Moran was aware Hixson was suffering any symptoms of high blood sugar. Hixson reports he suffered clouded vision and pain and tingling in his

11

extremities, but he never complained of any such symptoms to Dr. Moran when he met with him. While Hixson states he asked nurses for insulin, there is no evidence that he complained to them of symptoms warranting medication. Indeed, Nurse Raynes testified in her deposition that she believed Hixson to be asymptomatic for the entirety of his incarceration. ECF No. 199-4, at 49. Further, given the variability of Hixson's blood sugar readings, Dr. Moran was concerned about an insulin overdose. The medical staff's belief that Hixson was suffering no symptoms of high blood sugar and the unpredictability of Hixson's blood sugar levels fatally undermines any inference of the necessary subjective mental state.

Both parties have referenced Scinto v. Stansberry, 841 F.3d 219 (4th Cir. 2016), in their briefs. Hixson argues the Scinto facts are on point while Dr. Moran draws distinctions between the two situations. In Scinto, a former federal prisoner brought suit against several federal prison officials alleging that a prison doctor violated his Eighth Amendment rights by denying him insulin to treat his type 1, insulin-dependent diabetes. Id. at 225. Upon his entry into prison, plaintiff was initially prescribed insulin according to a sliding scale of blood sugar readings. Id. When this prescription proved insufficient to control plaintiff's blood sugar, he requested a supplemental injection from the prison doctor. Id. at 227. Because plaintiff was "angry" at the time of this request, the doctor terminated plaintiff's visit and declined to provide him with insulin, instead limiting his prescription significantly. Id. After several more similar incidents, plaintiff's hemoglobin A1C levels rose from 7 (within the normal range for diabetics) to 9.8 (an unhealthy score). Id. at 228. Plaintiff also suffered damage to his kidneys, eyesight, nervous system, and psychological wellbeing. Id. The court

12

ruled that plaintiff had adduced enough facts showing deliberate indifference to survive defendant's motion for summary judgment. Id. at 230.

Hixson argues that the Scinto decision compels denial of Dr. Moran's motion. Scinto, however, was decided on very different facts. First, the prison doctor in Scinto was well aware of plaintiff's serious medical condition and had prescribed an insulin regimen under which plaintiff was to receive supplemental injections when his blood sugar reached a certain level. Id. at 229. Furthermore, plaintiff's "lengthy prison medical records show[ed] that his diabetes diagnosis was 'longstanding, pervasive, well-documented, [and] expressly noted by prison officials,' including by [the prison doctor] himself." Id. (quoting Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)). As noted by the Fourth Circuit in Scinto, the prison doctor there "disregard[ed] his own prescription designed to manage [plaintiff's] condition," id. at 229, because he was "an angry and hostile patient." Id.

Here, in contrast, this case boils down to a disagreement as to treatment between Hixson and Dr. Moran. While Hixson alleges he should have received medication, Dr. Moran chose to monitor his blood sugar and treat his variable readings with diet. Dr. Moran testified about the risks of providing insulin to a patient with such variable blood sugar readings. When Hixson's readings rose, Dr. Moran ordered twice daily testing, again recognizing significant variability in the daily readings. Under the circumstances, Dr. Moran's care of Hixson and his decision to monitor his diabetes and treat him with diet rather than medication cannot constitute deliberate indifference. Dr. Moran's daily monitoring of Hixson's blood sugar readings shows that he was not deliberately indifferent to Hixson's medical condition. These facts cannot show either subjective awareness of a significant risk

13

or a deliberate indifference to that risk.[5] The court therefore **GRANTS** the motion for summary judgment and **DISMISSES** Count I.

## IV.

The Virginia Supreme Court has defined gross negligence as a "degree of negligence" which shows "such indifference" as to "constitute[ ] an utter disregard of prudence amounting to the complete neglect of the safety" of another. Ferguson v. Ferguson, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971). This degree of negligence must be such as would shock fair-minded people, though it need not constitute willful recklessness. Koffman, 574 S.E.2d at 60. Gross negligence requires an objective inquiry; the defendant's behavior must be compared to that of a similarly situated, hypothetical "reasonable" person. Coppage v. Mann, 906 F. Supp. 1025, 1049 (E.D. Va. 1995). Whether behavior constitutes gross negligence is usually a question of fact, left for the jury to answer. Gedrich v. Fairfax County Dept. of Family Servs., 282 F. Supp. 2d 439, 475 (E.D. Va. 2003).

Though the standards of deliberate indifference and gross negligence are closely related, courts do draw distinctions. Gross negligence is a slightly lower standard, lacking the subjective component of deliberate indifference. Coppage, 906 F. Supp at 1049. Unlike deliberate indifference, gross negligence does not require a finding that a defendant knew of a substantial risk. Id. It is enough that the defendant should have been aware of that risk. Id.

---

[5] In a supplemental pleading following the hearing, Hixson asks the court to focus on certain deposition testimony. ECF No. 215. This testimony does not give rise to a genuine issue of material fact as to deliberate indifference. While Hixson describes experiencing blurry vision and pain in his feet while in HRRJ, ECF No. 199-2, at 14, he does not claim to have reported this to a nurse or Dr. Moran. Similarly, Dr. Rupe described Hixson's blurry vision in her deposition and identified this as a symptom of elevated blood sugar levels, ECF No. 199-5, at 50, 99, but offered no testimony establishing that any member of the medical staff at HRRJ was aware of these symptoms. These facts do not raise any inference that Dr. Moran was aware of a serious risk to Hixson's health.

As discussed above, during his intake Hixson told the nurse at HRRJ that he was a type 1, insulin-dependent diabetic. Dr. Moran stated he decided not to medicate partially because "the information given by an inmate is statistically proven to sometimes be not totally correct." ECF No. 199-3, at 10. Dr. Moran therefore requires a confirmation through medical records of a prisoner's diagnosis before prescribing medication. Id. Dr. Moran went on to say:

> And had I have automatically placed Mr. Hixson on the medications he said he was on, if we look at his blood sugars during his first few days at the jail, I think we would be sitting here having a different deposition when I overdosed Mr. Hixson on insulin that his body didn't need. So, no, I did not automatically place him on medication just because he said he was on it because I'm responsible for them both for treating disease they have and for not causing any damage.

Id. Dr. Moran therefore placed Hixson on a diabetic diet and ordered daily checks of his blood sugar level. Id.

In December 2016, Hixson's blood sugar levels rose; Dr. Rupe testified that his readings were "definitely on a consistent basis well above the 130 mark," which is above the American Diabetes Association guidelines recommended fasting blood sugar readings. ECF No. 199-5, at 102. Dr. Moran's response was to increase Hixson's blood sugar readings from once daily to twice daily. As discussed above, Dr. Rupe opines that this was inadequate. She argues that at this point, Hixson should have been receiving insulin injections, and that the failure to do so caused permanent damage. Id. Dr. Moran's expert, Dr. Suaava, disagrees and states in her report that the decision not to administer insulin was reasonable, given the variable nature of Hixson's blood sugar readings and weight during his incarceration. ECF No. 190-9, at 3.

As with deliberate indifference, disagreements between medical professionals do not suffice to show gross negligence. Just because one medical professional claims the other should have done more than he did does not give rise to a level of negligence "which shows indifference to others, disregarding prudence to the level that safety of others is completely neglected." Wilby v. Gostel, 265 Va. 437, 445, 578 S.E.2d 796, 801 (2003). Were this claim sounding in ordinary negligence, Hixson may have been able to argue that Dr. Moran should have taken more affirmative steps to manage his diabetes. Dr. Moran, however, has already shown he is entitled to sovereign immunity, which shields him from medical malpractice suits sounding in ordinary negligence. ECF No. 166. Hixson is now required to show gross negligence, a much higher standard that he cannot meet.

The record clearly shows that Dr. Moran took steps to monitor Hixson's condition. Virginia law makes clear that if defendants have taken "even the slightest bit of care [ ], regardless of how insufficient or ineffective it may have been," then there has been no showing of gross negligence. Elliot v. Carter, 292 Va. 618, 621, 791 S.E.2d 730, 731 (2016). Accordingly, the court **GRANTS** the motion and **DISMISSES** Count II.

V.

Dr. Moran also argues that he is entitled to qualified immunity on both the § 1983 claim and the state medical malpractice claim. The doctrine of qualified immunity, a federal common law precept applicable in § 1983 cases, shields official defendants from monetary liability so long as the official's conduct did not violate "clearly established" statutory or constitutional rights of which a reasonable person in the defendant's position would have known. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); Weller v. Dep't of Soc. Servs. for City

16

of Balt., 901 F.2d 387, 398 (4th Cir. 1990). The principle of qualified immunity reflects the concern that the award of civil damages against public officials for every judicially-determined violation of rights would discourage individuals from seeking public employment, prove deleterious to the treasury, and impair governmental decision making. Weller, 901 F.2d at 398. The doctrine of qualified immunity, therefore, mandates that officials "are not liable for bad guesses in gray areas," but instead are only "liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

In determining if a defendant is entitled to qualified immunity, the court must first determine whether, taken in the light most favorable to a plaintiff, the facts alleged allow a finding that the defendant's conduct violated the plaintiff's constitutional rights. If the answer to this is yes, then the court must consider whether this particular right was "clearly established" at the time of the violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). As this court has ruled that Dr. Moran did not show deliberate indifference to Hixson, the first step of the above analysis must be answered in the negative. Therefore, to the extent the determination is relevant, Dr. Moran is entitled to qualified immunity on Hixson's § 1983 claim.[6]

## VI.

For the above reasons, Hixson's claims against Dr. Moran are **DISMISSED**. Without these substantive underlying claims, Hixson's claims for punitive damages and

---

[6] The qualified immunity calculus is inapplicable to the state law claim of gross negligence. John Doe #1 v. Robinson, No. CIV.A. 4:07CV84, 2009 WL 435097, at *4 (E.D. Va. Feb. 20, 2009) (citing Colby v. Borden, 241 Va. 125, 129, 400 S.E.2d 184, 186 (1991)).

attorneys' fees are groundless and **DISMISSED**. Defendant's Motion for Summary Judgment is **GRANTED**.

An appropriate Order will be entered this day.

Entered: This 23rd day of January, 2018

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge